**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TSAWD HOLDINGS, INC., et al., | ) | |
| | ) | Case No. 16-10527 (MFW) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |
| | ) | |
| TSA STORES, INC., TSA PONCE, INC., and TSA CARIBE, INC., | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR ADMINISTRATIVE AND COLLATERAL AGENT, | ) ) ) ) | Adv. No. 16-50368(MFW) |
| | ) | |
| Plaintiff-Intervenor/ Counterclaim Defendant, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPORT DIMENSION INC. a/k/a BODY GLOVE, | ) ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

**OPINION**[1]

Before the Court are cross-motions for summary judgment filed by Wilmington Savings Fund Society, FSB ("WSFS") and Sport Dimension a/k/a Body Glove ("Sport Dimension"). The dispute is which party has a priority interest in the inventory, and its proceeds, sold by the Debtors on consignment from Sport Dimension (the "Disputed Goods"). For the reasons stated below, the Court

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

will grant WSFS's motion and deny Sport Dimension's motion.

I.  BACKGROUND

   A.  Factual History

On March 2, 2016, (the "Petition Date") The Sports Authority Holdings, Inc. and its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11. The Debtors were national retailers of sporting goods and active apparel.

     1.  Relationship of WSFS and Debtors

In 2006, the Debtors entered into a secured financing facility that included a term loan which, following a refinancing in 2010, amounted to $300 million (the "Term Loan"). (Orenstein Decl. Ex. A, Adv. D.I. 83-1.) Bank of America ("BOA") was the administrative agent for the group of lenders providing the Term Loan (the "Term Loan Lenders"). (Id.) As of the Petition Date, approximately $276.7 million, exclusive of accrued and unpaid interest, fees, and other obligations, was outstanding under the Term Loan. (Aguilar First Day Decl. ¶ 27, D.I. 22.)

The Term Loan was secured by, in part, a second-priority lien on the Debtors' inventory, including all after-acquired inventory and proceeds thereof.[2] (Orenstein Decl. Ex. B at 2,

---

[2] In the course of the bankruptcy case, the lenders who originally had a first priority lien on the Debtors' inventory were paid in full. (See Final DIP Order at ¶¶ 2 & 17, D.I. 1699). The Term Loan Lenders, therefore, now have a first priority lien therein.

Adv. D.I. 83-2.) The lien was perfected by the execution of a security agreement and the filing of UCC-1 financing statements and continuation statements in the appropriate jurisdictions. (Orenstein Decl. Exs. B-F, Adv. D.I. 83.) On December 31, 2015, WSFS succeeded BOA as the administrative agent (the "Term Loan Agent"). (Brooks Decl. Exs. B & C, Adv. D.I. 87.)

    2.   <u>Relationship of Sport Dimension and the Debtors</u>

As part of their business, the Debtors developed a program for the sale of goods on consignment. To participate in the program, vendors entered into a "pay by scan" deal sheet specifying whether they would be paid on a cost or retail split basis. The Debtors paid the vendors in accordance with the terms of their respective consignment agreements, which was either a fixed amount for each item sold or a percentage of the retail sale price.

Sport Dimension is a manufacturer of athletic apparel under the "Body Glove" brand. Sport Dimension began selling its Body Glove apparel to the Debtors in the 1990s. Around 2011, Sport Dimension entered the Debtors' pay by scan consignment program on a retail split basis – 45% to Sport Dimension and 55% to the Debtors. (Orenstein Decl. Ex. K, Adv. D.I. 83.) Sport Dimension did not file a UCC-1 to cover the goods it provided to the Debtors on consignment until January 25, 2016, approximately one month before the Petition Date. (<u>Id.</u> at Ex. L, Adv. D.I. 83.)

B.  <u>Procedural History</u>

Early in the Debtors' bankruptcy case, an issue arose as to the Debtors' authority to pledge or sell consigned goods in their possession.  Pending the filing of (and ruling on) an adversary proceeding to determine respective rights to the consigned goods, the Court permitted the Debtors to sell the consigned goods so long as they complied with the terms of the consignment agreements, including making payments to the consignors.  (<u>See</u> Final Order, D.I. 1704.)  The Final Order preserved WSFS's rights as the Term Loan Agent, including the right to recoup any payments made to the consignors from the sale of the consigned goods if it were determined that WSFS had a superior security interest in them.  (<u>Id.</u>)

On March 16, 2016, the Debtors commenced this adversary proceeding against Sport Dimension, seeking declaratory relief on competing claims to the Disputed Goods. (Adv. D.I. 1.)  WSFS intervened in the adversary proceeding and seeks a declaration that it has a perfected security interest senior to Sport Dimension's interest in the Disputed Goods and seeks disgorgement of their proceeds.  (Adv. D.I. 2.)  Sport Dimension filed an answer and counterclaim seeking a declaration that WSFS's security interest did not attach to the Disputed Goods and, if it did, that WSFS's lien is subordinate to Sport Dimension's interest.  (Adv. D.I. 22.)

On September 10, 2018, the parties filed cross-motions for summary judgment seeking a determination of their respective interests in the Disputed Goods. (Adv. D.I. 79 & 84.) Briefing is complete, and the matter is now ripe for decision.

II. <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding, as it is a core proceeding dealing with the determination of the validity, priority, and extent of liens on property of the estate. 28 U.S.C. §§ 1334(b), 157(b)(2)(K).

Sport Dimension does not consent to entry of any final order or judgment by the Court. (Sport Dimension Answer ¶ 3, Adv. D.I. 21.) However, this Court has concluded in a similar proceeding in this case that (1) Article III does not prohibit the Court from hearing such "core proceeding[s]," and that (2) "Article III does not limit the Court's authority to enter final judgment on the claims and counterclaims at issue . . . ." <u>TSA Stores, Inc. v. MJ Soffe, LLC</u>, 565 B.R. 292, 297 (Bankr. D. Del. 2017) (distinguishing <u>Stern</u> and finding that "the action at issue . . . would necessarily be resolved in the claims allowance process") (quoting <u>Stern v. Marshall</u>, 564 U.S. 462, 564 (2011)). Therefore, the Court concludes that it has jurisdiction to hear this core proceeding and authority to enter a final judgment on the claims and counterclaims at issue.

III. <u>STANDARD OF REVIEW</u>

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56(c) of the Federal Rules of Civil Procedure, which sets forth the applicable summary judgment standard. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (holding that the party moving for summary judgment has the initial burden of demonstrating the absence of a dispute of material fact). Admissions in pleadings, affidavits, discovery, and disclosure materials on file, including all factual inferences derived therefrom, are viewed in the light most favorable to the nonmoving party. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).

IV. <u>DISCUSSION</u>

WSFS argues that Article 9 of the Uniform Commercial Code (the "UCC") governs the priority of the competing interests in the Disputed Goods and that WSFS's interest is superior to Sport Dimension's because its financing statement was filed first. <u>See</u> Del. Code Ann. tit. 6, § 9-322(a)(1). Sport Dimension argues that Article 9 does not govern the priority of the parties'

interests because the Disputed Goods do not meet the UCC's definition of "consignment."  See id. at § 9-102.  See also In re Valley Media, Inc., 279 B.R. 105, 124 n.33 (Bankr. D. Del. 2002) (recognizing that only consignments that meet the UCC's definition of consignment are subject to the UCC's priority rules).

    A.    Consignment under Article 9

Section 9-102(a)(20) of the UCC defines "consignment" as:

> A transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
>   (A) the merchant:
>     (i) deals in goods of that kind under a name other than the name of the person making the delivery;
>     (ii) is not an auctioneer; and
>     (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others.

Del. Code Ann. tit. 6, § 9-102(a)(20).

The only part of this definition that is in dispute in this case is the third prong: whether the Debtors were "not generally known by [their] creditors to be substantially engaged in selling the goods of others."  Id. at § 9-102(a)(20)(A)(iii) (the "Exception").  Under the Exception, the UCC will not govern the priority of the parties' interests if a consignor can show that (1) a consignee's creditors generally know that (2) the consignee substantially engaged in selling the goods of others.  As this Court has previously recognized, the Exception is also satisfied

if a consignor can show that (1) the other creditor <u>actually</u> knew that (2) the consignee (i) substantially engaged in selling the goods of others and/or (ii) sold the goods of the <u>specific</u> consignor in dispute.  <u>See</u> <u>TSA Stores, Inc. v. Wilmington Savings Fund Society, FSB</u>, No. 16-10527 (MFW), 2018 WL 6839743, at *7 (Bankr. D. Del. Nov. 26, 2018) (citing <u>Fariba v. Dealer Services Corp.</u>, 178 Cal. App. 4th 156 (2009)).

        1.   <u>Imputation of knowledge to Lenders</u>

WSFS argues initially that any knowledge it, or its predecessor Term Loan Agent, may have acquired about the Debtors' consignment practices cannot be imputed to the Term Loan Lenders. It contends that the Term Loan Agent's agency was narrow and its duties were expressly limited by the provisions of the Term Loan. <u>Huston v. Proctor & Gamble Paper Prods. Corp.</u>, 568 F.3d 100, 106 (2009) ("[T]here are two parameters limiting when knowledge of facts known by an agent is imputed to the principal: the agent's duties to the principal; and the materiality - or significance - of the facts in question to those duties.")  WSFS contends that knowledge of Sport Dimension's consignments was not material to its duties as the Term Loan Agent.

Sport Dimension argues that knowledge of competing liens was material to the Term Loan Agent's duties to the Lenders and, therefore, imputable to the Lenders.  Restatement (Third) Agency § 5.03 (2006).

8

An agent has a duty "to provide the principal with facts that the agent knows, has reason to know, or should know when . . . the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal." Id. at § 8.11.  See, e.g., In re Marriage of Cloney, 110 Cal. Rptr. 2d 615, 624 (Cal. 2001) (stating that an agent has a duty to disclose to its principal all material information, or information "that may affect [its] principal's decision [making process].")  Delaware courts will impute an agent's knowledge to its principal when such knowledge is material to the agent's duties, i.e., "the knowledge has some significance which the [agent] could be reasonably expected to perceive."  Affordable Home Enters. v. Nelson, No. 91C-08-024, 1994 WL 315227, at *7-9 (Del. Super. May 25, 1994) (internal citation omitted) (concluding that a corporation will be bound by information obtained by its agent employee that would be viewed as "important in view of the agent's duties and prior knowledge.").

WSFS relies on section 9.03 of the Term Loan which states that "the [Term Loan Agent] shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents."  (Orenstein Decl. Ex. A at § 9.03, Adv. D.I. 83.)  However, section 9.01(a) provides that "[E]ach of the Lenders . . . hereby irrevocably appoints and authorizes [Term

Loan Agent] to act as the agent of such Lender for purposes of <u>acquiring, holding and enforcing any and all Liens on Collateral</u> . . . .") (<u>Id.</u> at § 9.01(b) (emphasis added)).

The Court, therefore, rejects WSFS's assertion that the Term Loan Agent's duties under the Term Loan did not require it to inform the Lenders of any knowledge it acquired regarding Sport Dimension's status as a consignor.  <u>See</u> <u>TSA Stores, Inc. v. MJ Soffe, LLC</u>, No. 16-50364, 2018 WL 6885922, at *6 (Bankr. D. Del. Nov. 26, 2018).  It was clearly within the scope of the Term Loan Agent's duties to ascertain what other interests existed on property that it was taking as security for the Term Loan. "Enforcing any and all liens on Collateral" entails considering the effect of a competing interest on the priority of one's own lien.  (Orenstein Decl. Ex. A at § 9.01(b).)

Thus, the Court concludes that if the Term Loan Agent had <u>actual knowledge</u> that the Debtors were <u>substantially engaged</u> in selling the goods of others or actual knowledge of Sport Dimension's <u>specific</u> consignment relationship with the Debtors, such knowledge was imputed to the Term Loan Lenders.

    2.   <u>Actual knowledge of substantial engagement in consignment sales</u>

Sport Dimension argues that the Term Loan Agent had "actual knowledge" that the Debtors were "substantially engaged" in selling the goods of others.  Sport Dimension alternatively argues that the Term Loan Agent had "actual knowledge" that the

10

Debtors sold "some" portion of their inventory on a consignment basis. Sport Dimension concludes that such actual knowledge satisfies the Exception and takes its interest outside the purview of Article 9.

WSFS responds that the Debtors never "substantially engaged" in consignment transactions. WSFS and the Debtors stipulated that at no point, pre-or-post petition, did the Debtors' total inventory include more than 14% of consigned goods. (Stip. of Facts, D.I. 1400.) WSFS asserts, therefore, that the Debtors' proportion of consignment transactions does not rise to the minimum 20% threshold that courts have recognized for "substantial engagement." See Valley Media, 279 B.R. at 132 (holding that a debtor with 17.03% of its inventory sold on consignment does not qualify as being "substantially engaged" in selling the goods of others).

While Sport Dimension concedes that the Debtors' total inventory available for sale never included more than 14% consigned goods, it argues that such a portion is sufficient to constitute substantial engagement and that the 20% threshold is merely a "general rule of thumb," not a bright-line rule. (Sport Dimension Opp. Brief at 6-7, Adv. D.I. 91.) Rayfield Inv. Co. v. Kreps., 35 So. 3d 63, 66 (Fla. Ct. App. 2010) (explaining that "[t]he cases follow a general rule of thumb that consignees are not considered to be substantially engaged in selling the goods

11

of others unless they hold at least 20% of inventory on a consignment basis"). See also In re Creative Goldsmiths of Washington, D.C., 178 B.R. 87, 93 (Bankr. D. Md. 1995) (merely requiring "some evidence" that would allow the court to reasonably conclude that the Debtor was substantially engaged in selling consigned goods). Sport Dimension concludes that because there is no bright-line rule, this Court should find that 14% is sufficient to satisfy the Exception's "substantial engagement" element.

The Court rejects this argument. The Court has previously held that the threshold for substantial engagement is met only if consigned goods comprise "20% or more" of the value of the Debtors' inventory. TSA Stores, Inc. v. Performance Apparel Corp., Adv. No. 16-50317 (Bankr. D. Del. March 7, 2017) (citing Valley Media, 279 B.R. at 123-24). Additionally, in all but one of the cases cited by both WSFS and Sport Dimension, the minimum 20% threshold was either expressly articulated or factually satisfied. See, e.g., In re State Street Auto Sales. Inc., 81 B.R. 216, 218 (1998) (stating that substantial engagement "requires that the consignee must be 'primarily' [i.e., 51%] engaged in selling the goods of others"); Rayfield Inv., 35 So. 3d at 65 (holding that the Exception was not satisfied where consigned goods did not exceed 15% of inventory because a minimum of 20% is the "rule of thumb"); Fariba, 178 Cal. App. 4th at 158

(finding the debtor was "substantially engaged" in selling the goods of others where 45% of its inventory was comprised of consigned goods).

Sport Dimension's reliance on Creative Goldsmiths is misplaced. While Creative Goldsmiths did not acknowledge a bright-line minimum threshold and stated that substantial engagement does not require "primarily" dealing in consigned goods, it ultimately determined that the consignor had not proven that the debtor was substantially engaged in selling the goods of others because there was insufficient evidence to make such a finding. 178 B.R. at 93. Therefore, the Court finds that Creative Goldsmiths does not provide a basis for departing from the minimum 20% threshold.

Sport Dimension also cites Eurpac in support of its contention that 20% is not required to satisfy the Exception. Eurpac Serv. Inc. v. Republic Acceptance Corp., 37 P.3d 447, 449 (Colo. App. 2000). However, the Eurpac Court did not rely on actual knowledge of the "substantial engagement" portion of the Exception for its ruling. Instead, its ruling was predicated on actual knowledge of the specific consignor's relationship with the debtor. Id.

Lastly, Sport Dimension argues that the Debtors' CFO, Jeremy Aquilar, testified in the bankruptcy case that a "substantial portion of the Debtors' business involves the sale of goods on

consignment." (Aquilar First Day Decl. at ¶ 26, D.I. 22.) Sport Dimension asserts that this admission alone should be dispositive of the issue.

WSFS, however, directs the Court's attention to the Debtors' representation in the Term Loan, which explicitly states that consignment inventory was "an immaterial portion of total inventory for sale." (Orenstein Decl. Ex. B at Schedule 3.06, Adv. D.I. 83-2.) WSFS argues that the Debtors represented and warranted to the Lenders that they would not sell consignment inventory other than that "immaterial portion" listed on Schedule 3.06 of the Term Loan. (Id.) In addition, as noted above, the Debtors have stipulated that they never held more than 14% of their inventory on consignment. (Stip. of Fact, D.I. 1400.) WSFS argues, therefore, that such representations preclude a finding that the Lenders had actual knowledge of the Debtors' substantial engagement in consignment sales.

The Court agrees with WSFS. The minimum threshold for substantial engagement is 20% of consigned goods. Mr. Aguilar's imprecise testimony that a "substantial portion" of the Debtors' business involved consigned goods does not provide sufficient evidence that the Debtors met that legal threshold. Further, that testimony is contradicted by the more recent and more specific admission by the Debtors that they did not sell more than 14% of their inventory on consignment.

14

Even if the Debtors' statements alone could establish "substantial engagement," they do not establish the Term Loan Agent's actual knowledge at the time the Term Loan was extended. <u>MJ Soffe</u>, 2018 WL 6885922 at *6 (finding that actual knowledge must be present at the time the Term Loan was incurred). In this case, the Debtors' representation in the Term Loan documents to the Agent was that the Debtors were <u>not</u> substantially engaged in selling goods on consignment. (Orenstein Decl. Ex. B at Schedule 3.06, Adv. D.I. 83-2.) Thus, the Court finds that Aguilar's testimony neither establishes the Debtors' substantial engagement in consignment sales nor the Term Loan Agent's actual knowledge of substantial engagement.

Accordingly, the Court finds that Sport Dimension did not establish that the total value of consignments in the Debtors' inventory exceeded the minimum 20% threshold or that the Term Loan Agent actually knew that the Debtors were "substantially engaged" in selling the goods of others.

   3. <u>Actual knowledge of specific consignor</u>

Sport Dimension also argues that WSFS conflates the "general knowledge" exception with the "actual knowledge" exception. It argues that courts require <u>neither</u> knowledge of substantial engagement <u>nor</u> of a specific creditor when considering whether <u>actual</u> knowledge has satisfied the Exception. It asserts instead that actual knowledge that "some" portion of the Debtors'

15

business deals with consignments is sufficient to satisfy the Exception.  See Eurpac, 37 P.3d at 348-50; Fariba, 178 Cal. App. 4th at 171-72; GBS Meat Industry Pty. Ltd. v. Kress-Dobkin Co., Inc., 474 F. Supp. 1357 (W.D. Pa. 1979).  On this basis, Sport Dimension asserts it is sufficient that the Term Loan Lenders had actual knowledge of other consignments, as evidenced by (i) Schedule 7.01(b) of the Term Loan which lists some other consignors, (ii) the Debtors' audited financials which identified consigned inventory of other consignors, and (iii) the public UCC-1 filings of a number of other consignors.  (Brooks Decl. Exs. D, G-J, Adv. D.I. 87.)

WSFS argues that actual knowledge of either "substantial engagement" or of the specific consignor (i.e., Sport Dimension) is required to satisfy the Exception.  It contends that actual knowledge of "some" of the Debtors' other consignment relationships is insufficient if "some" does not rise to the minimum level of 20%.  WSFS states that neither the Term Loan Agent nor Term Loan Lenders had actual knowledge of substantial engagement or of Sport Dimension's consignments specifically and, therefore, the Exception is not satisfied.

The Court agrees with WSFS.  The second prong of the Exception requires that the Lenders have actual knowledge that Sport Dimension specifically was dealing on a consignment basis with the Debtors.  See TSA Stores, Inc. v. Performance Apparel

Corp., 595 B.R. 676, 683 (Bankr. D. Del. 2018).  Sport Dimension concedes that it has no evidence of actual knowledge by the Term Loan Agent (or Lenders) of its consignment arrangement.

Sport Dimension's reliance on Eurpac, Fariba and GBS Meat is misplaced.  All three cases involved actual knowledge of a specific consignor and/or substantial engagement and, therefore, contradict Sport Dimension's argument.  In Eurpac, for example, the court found that the creditor "understood that a portion" of the debtor's inventory consisted of consigned goods and that the debtor's consignment inventory was identified in separate schedules, which included the specific consignor in dispute. Eurpac, 37 P.3d at 449.  Similarly, in both Fariba and GBS Meat, the courts found that the secured creditors had actual knowledge of the specific consignors in dispute.  Fariba, 178 Cal. App. 4th at 171; GBS Meat, 474 F.Supp. at 1358.

Thus, the Court concludes that neither prong of the Exception contained in section 9-102(a)(20) is satisfied and, therefore, the priorities of the parties' interests is governed by Article 9.

    B.    Priority of Interests under Article 9

WSFS argues that (i) it satisfied each requirement for the creation of an enforceable security interest in the Disputed Goods under Article 9, (ii) it perfected its security interest long before Sport Dimension perfected its interest, and (iii)

17

Sport Dimension failed to take the steps necessary to obtain priority under the UCC's inventory collateral rule.  See Del. Code Ann., tit. 6, §§ 9-322, 9-324.  Sport Dimension only disputes the third contention.

Under section 9-322(a), conflicting perfected security interests rank according to priority in time of UCC-1 filings. However, section 9-324(b) provides an exception for a party who obtains a purchase money security interest ("PMSI"), such as a consignment interest,[3] in inventory collateral that is already subject to a prior perfected security interest.  Id. at § 9-324(b)(1)-(4).  Under that provision, the later filing PMSI-holder may obtain a priority interest in inventory it delivers to the consignee if it meets the following requirements:

> (1) the purchase-money security interest is perfected when the debtor receives possession of the inventory;
> (2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;
> (3) the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and
> (4) the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

Id. at § 9-324(b)(1)-(4).  WSFS argues that Sport Dimension failed to provide proper notice under subsections (2) and (3).

---

[3] The UCC provides that "the security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory."  Del. Code Ann. tit. 6, § 9-103(d).

Sport Dimension filed a UCC-1 on January 25, 2016, creating a PMSI in inventory delivered to the Debtors on consignment after that date.  (Brooks Decl. Ex. L, Adv. DI. 87-12; Orenstein Decl. Ex. J, Adv. D.I. 83.)  Sport Dimension provided notices of its UCC-1 filing that same day to a number of the Debtors' creditors, including BOA, the <u>predecessor</u> Term Loan Agent.  (Brooks Decl. Ex. M, Adv. D.I. 87-13.)  Sport Dimension argues, therefore, that it satisfied the requirements of section 9-324(b) and its interest has priority over WSFS's prior perfected interest.

WSFS argues that Sport Dimension's notice to BOA failed to satisfy the UCC's notice requirement.  To satisfy the requirement, a consignor must send notification to the addresses of other secured parties that appear on their respective UCC-1s.  <u>See</u> § 9-324(b), cmt. 6.  At the time Sport Dimension provided notice to BOA (January 25, 2016), WSFS as successor Term Loan Agent had already filed an amended UCC-1 reflecting its address (December 31, 2015).  (Orenstein Decl. Ex. C, Adv. D.I. 83-3.)  WSFS asserts, therefore, that Sport Dimension failed to provide notice to the appropriate address and, accordingly, failed to satisfy the requirements for obtaining a priority PMSI.

The Court agrees with WSFS.  Sport Dimension provides no legal authority to support its argument that proper notice is provided by notice to a predecessor agent to a secured party. Nor is there any evidence that BOA forwarded the notice to WSFS.

19

Thus, the Court finds that Sport Dimension has failed to satisfy the requirements of section 9-324(b) and, consequently, WSFS's lien has priority. Therefore, the Court concludes that all proceeds of the Disputed Goods that were paid to Sport Dimension postpetition must be disgorged. (See Final Order ¶ 8, D.I. 1704 at 5.)

IV. CONCLUSION

For the foregoing reasons, the Court will deny Sport Dimension's motion for summary judgment and grant WSFS's motion.

An appropriate order follows.

Dated: April 12, 2019                BY THE COURT:

*[signature]*

Mary F. Walrath
United States Bankruptcy Judge